**CLOSED**

# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

CHAMBERS OF
**DENNIS M. CAVANAUGH**
JUDGE

THE FRANK R. LAUTENBERG
UNITED STATES POST OFFICE
AND COURTHOUSE BUILDING
NEWARK, NJ 07101
Room No. 451
(973) 645-3574

March 13, 2006

NOT FOR PUBLICATION

LETTER-OPINION AND ORDER

ORIGINAL FILED WITH THE CLERK OF THE COURT

*Patricia M. Franklin, Esq.*
Binder & Binder
81 Halsey Street, P.O. Box 32207
Newark, New Jersey  07102

*Christopher J. Christie, Esq.*
United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102

      Re:   <u>Catherine Steen v. Commissioner of Social Security</u>
              Civil Action No.: 02-5200

Dear Counsel:

      This action is brought under Section 205(g) of the Social Security Act (the "Act") as

amended, 42 U.S.C § 405(g) (2000) ("Section 405(g)") to appeal the final determination of the

Commissioner of Social Security denying the application of Plaintiff Catherine Steen

("Plaintiff") for disability insurance benefits ("DIB") and Supplemental Security Income

("SSI").[1]  For the reasons set forth below, the final determination of the Commissioner is

affirmed.

---

[1]     In support of this appeal, Steen submitted: Brief of Plaintiff (the "Moving Br.") and Reply Brief of Plaintiff (the "Reply Br."). In opposition, the Commissioner submitted: Defendant's Brief Pursuant to Local Civil Rule 9.1 (the "Opp'n Br.") and the entire record and transcripts of the proceedings ("Tr.").

Page 2

# I. <u>BACKGROUND</u>

## A. Procedural History

Plaintiff filed applications for DIB and SSI under the Act on August 17, 2000,, alleging disability due to Arthritis, Diabetes Mellitus, Migraines and dizziness as of November 16, 1996. (Tr. 70-72).  Plaintiff's applications were denied both initially and upon review.  (<u>Id</u>. at 57-66, 66-68.)

Plaintiff requested a hearing, which was held on January 7, 2002, before Administrative Law Judge ("ALJ") Ralph J. Muehlig.  (<u>Id</u>. at 30-56).  On January 25, 2002, the ALJ issued an Opinion in which he determined Plaintiff was not entitled to a period of disability, DIB, and SSI under Sections 216(i), 223, and 1614(a)(3)(A) of the Act.  (<u>Id</u>. at 11-21).  Plaintiff appealed the ALJ's determination and presented additional medical evidence.  (<u>Id</u>. at 6, 196, 199-06.) Plaintiff's appeal was denied by the Appeals Council, who found no basis for review of the ALJ's decision, despite Plaintiff's additional medical evidence concerning her mental and physical health and the New Listings for Musculoskeletal Impairments (the "New Listings"), effective February 19, 2002.  (<u>Id</u>. at 4-6.)  On or about October 31, 2002, Plaintiff filed a Complaint with this Court seeking judicial review pursuant to Section 405(g) and 42 U.S.C. § 1381c) (2000).  (Plaintiff's Complaint ("Pl. Compl.") at ¶1).

## B. Plaintiff's Testimony

Plaintiff was born on May 15, 1949, and has a high school education.  (Tr. 57, 15). Plaintiff testified she last worked in year 2000, as a babysitter for her daughter's four children and was paid by Work First New Jersey, a welfare-reform program which pays for working

parents' childcare.  (Id. at 33-35).  Plaintiff testified that although she worked for Work First, she could not babysit other children while she was ill.  (Id. at 37, 40-42).

Prior to babysitting, Plaintiff worked as a retail salesclerk at Value City for seven and a half years.  (Id. at 45-46).  Her job entailed cashiering, packing and picking up boxed merchandise for lay-away, handling customer returns, and ensuring the floors and aisles of the store were straightened and clear.  (Id. at 46, 47).  Plaintiff was dismissed from Value City in 1996, as a result of her increasing absences, which sometimes amounted to her missing two to three months of work per year.  (Id.)

At the hearing, Plaintiff complained of head and back aches, dizziness, ulcers, hypertension, monocular vision with correctable near and far-sightedness in her left eye, dry eyes requiring drops, insulin-dependent diabetes mellitus, chest pains, arthritis leading to numbness and knots in her hands, difficulties bending and stooping, asthma, high cholesterol, and anxiety. (Id. at 41-45, 48-50, 54).  In addition to her physical problems, she also testified she fears traveling alone or crossing streets without assistance.  (Id. at 23).  Plaintiff explained that her monocular vision arose nearly twenty years before she worked at Value City, her diabetes came on as early as 1982, and her anxiety arose after she left Value City.  (Id. at 44-45).  Plaintiff testified that her ulcers and frequent need to use the restroom interfered with her work, and her arthritis made it increasingly difficult for her to bend, reach, and use her hands.  (Id. at 50-51). Finally, Plaintiff testified that even if she had not been terminated, she would not have continued working because of her deteriorating health.  (Id. at 21).

**C. Medical Evidence**

Page 4

The following reports, letters and clinical notes were available to the ALJ, with the

exception of the last two documents, which were submitted to the Appeals Council as post-

hearing evidence.  The record consists of reports and evaluations from Chidi Anukwuem, M.D.

("Dr. Chidi Anukwuem"); M.A. Mohit, M.D. ("Dr. Mohit"); Thomas Materna, M.D. ("Dr.

Mohit"); a residual functional capacity ("RFC") assessment by Walsh, M.D. ("Dr. Walsh"); a

psychosocial assessment by Cynthia Jackson, a licensed clinical social worker ("LCSW") at

Newark Beth Israel Medical Center ("Beth Israel") (the "Beth Israel Psychosocial Assessment");

a psychiatric evaluation by Patricia Daly, a registered nurse ("R.N.") at Beth Israel(the "Beth

Israel Psychiatric Evaluation"); a report by Chinwendu Anukwuem, M.D. ("Dr. Chinwendu

Anukwuem"); a letter by Adekunle Adeoti, M.D. ("Dr. Adeoti"); and a report by Alice O'Shea,

M.D. ("Dr. O'Shea").

**1. Dr. Chidi Anukwuem's Reports**

Dr. Chidi Anukwuem, an internist, submitted a report to Plaintiff's Social Security

Claims Manager on November 17, 2000.  (Id. at 133).  Dr. Anukwuem reported Plaintiff had a

history of diabetes, migraines, arthritis, and dizzy spells.  (Id. at 131).  He attached a "Resting

ERG with Tracings" lab report, pertaining to Plaintiff's diabetes, to support his diagnoses.  (Id. at

131, 134-35).  Dr. Anukwuem concluded Plaintiff failed to exhibit any evidence of end organ

damage resulting from her diabetes, and gave Plaintiff a "fair" prognosis. (Id. at 131-132).  Dr.

Anukwuem concluded with the notation:

> Patient has Diabetes and is on insulin.  She has these frequent headache
> [sic] and dizziness that she describes as crippling.  Based on these, I
> consider her functionally limited, and disabled at this time.

Page 5

(Id. at 133).

Dr. Chidi Anukwuem also completed a Multiple Impairments Questionnaire.  (Id. at 177).
Dr. Anukwuem related Plaintiff's primary symptoms as dizziness, headaches, lower back pain,
fatigue, and occasional near-fainting episodes and diagnosed her with diabetes, asthma, Arthritis,
hypertension, peptic ulcer disease and panic disorder.  (Id. at 177-178).  The report also noted
that despite medication, Plaintiff constantly complained of moderately severe pain in her lower
back, while walking, sitting, stooping and bending exacerbated her pain.  (Id. at 179).

When prompted to estimate Plaintiff's RFC in a normal five-day work week,  Dr.
Anukwuem reported that out of an eight-hour day, Plaintiff could sit for one hour, stand/walk for
less than one hour, and would need to get up and move around every fifteen to thirty minutes for
about ten to fifteen minutes.  (Id. at 180).  He further estimated that Plaintiff could occasionally
lift or carry things no heavier than five pounds.  (Id.)

Dr. Anukwuem also opined that emotional factors could contribute to the severity of
Plaintiff's symptoms, but noted that he did not have any details which supported that opinion.
(Id. at 182).  Finally, Dr. Anukwuem concluded, "[t]o the best of my knowledge, the patient
appears to be in so much pain and discomfort, that it may be difficult for her to hold down any
job.  I consider her permanently disabled." (Id.)

## 2. Dr. Mohit's Report

Dr. Mohit's report, dated February 15, 2001, notes that Plaintiff's chief complaint
concerned pain and discomfort from headaches, which she has had since 1982.  (Id. at 142).
Plaintiff further informed the doctor that she could walk two to three blocks, sit for up to fifteen

minutes, and stand for roughly fifteen to twenty minutes.  (Id.)

Dr. Mohit diagnosed Plaintiff with cervical strain and headache.  (Id. at 144).  Dr. Mohit further observed that Plaintiff was not in any acute distress; had minimal difficulty walking, dressing, and getting on and off the examining table; did not use assistive devices to move around; was not uncomfortable sitting during the exam; had some difficulty walking on her heels and toes; exhibited normal range of movement in her neck and lower back areas; experienced pain on straight leg raising; had decreased sensation in both her upper and lower extremities, but did not have any motor abnormalities, muscle atrophy, or abnormal reflexes.  (Id. at 144-146).

### 3. Dr. Materna's Report

Dr. Materna's report, dated February 17, 2001, diagnosed Plaintiff with optic atrophy, very poor vision, and exotropia in her right eye.  (Id. at 148).  From these findings, he concluded Plaintiff was a "monocular-status patient" with corrected visual acuity of 20/25 in her left eye, but only finger-count vision in her right eye.  (Id.)  Dr. Materna opined Plaintiff was employable in some capacity, cautioning that she should not work around dangerous machinery or in a position requiring excellent vision.  (Id.)

### 4. Dr. Walsh's Residual Functional Capacity Assessment

Dr. Walsh, a non-examining state-medical consultant, completed an RFC Assessment for Plaintiff on  March 14, 2001.  (Id. at 150).  Dr. Walsh diagnosed Plaintiff with cervical strain, low vision in her right eye, hypertension, and diabetes.  (Id.)  Dr. Walsh concluded Plaintiff could frequently lift or carry up to ten pounds; occasionally lift or carry up to twenty pounds; stand, walk, or sit with normal breaks for roughly six hours in an eight-hour workday; push or pull

Page 7

without limitation, except those just noted; and occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  (Id. at 151-152).  He further found Plaintiff should avoid any concentrated exposure to extreme heat and cold, wetness, humidity, and any fumes, odors, dusts, gases, or poor ventilation; and all exposure to any hazards.  (Id. at 154).  Dr. Yeager and Dr. Levine, two other state consultants, reaffirmed this RFC Assessment.  (Id. at 157).

### 5. Beth Israel Psychosocial Assessment

Cynthia Jackson, LCSW, prepared a Psychosocial Assessment report after meeting with Plaintiff on August 9, 2001.  (Id. at 171).  Plaintiff reported experiencing panic attacks when crossing the street and intermittent depression since 1996, when she lost her job.  (Id.)  Jackson reported Plaintiff's memory was intact, her insight was fair, her judgment was impaired, and she exhibited anxiety symptoms.  (Id.)  Under "Patient Strengths/Weaknesses," Jackson noted Plaintiff had a good work history and was amenable to treatment.  (Id. at 175).  However, under "Other Pertinent Data," Jackson reported Plaintiff "may be looking for help to get SSI."  (Id.) Jackson recommended a psychiatric evaluation to assess the need for medication and referred Plaintiff to group counseling.  (Id. at 176).

### 6. Beth Israel Psychiatric Evaluation

Patricia Daly, R.N., also completed a psychiatric evaluation report, including clinical notes, on October 31, 2001.  (Id. at 164, 170).  Plaintiff initially met Daly on August 24, 2001, and chiefly complained of depression, regarding her finances and inability to cross the street or travel by herself, as well as trouble sleeping and passive thoughts of suicide.  (Id. 164-65).

Daly's report diagnosed Plaintiff using the Diagnostic and Statistical Manual of Mental

Page 8

Disorders ("DSM IV") multi-axial assessment test.  (Id.)  Daly diagnosed Plaintiff with major

depression, recurrent-severe; R/O Panic; and R/O Post Traumatic Stress Disorder.  (Id.)  Further,

Daly reported health and financial problems as Plaintiff's main concerns.  (Id.)  Daly diagnosed

Plaintiff with a level of 60, on a scale of 1 to 100 on the Global Assessment of Functioning Scale

("GAF").  (Id.; Moving Br. at 8).  A patient scoring level 60 exhibits moderate symptoms or

moderate difficulty in social occupational or school functioning.  (Id. at 8).  From these findings,

Daly recommended Paxil to help abate Plaintiff's Depression and Anxiety.  (Tr. 165).

Daly's clinical notes show regular meetings through October, 2001.  (Id. at 166).  Over

this time period, Daly prescribed Paxil, Serzone, and Risperdal to Plaintiff for her depression and

anxiety.  (Id.)

According to Daly's notes of September 27, 2001, Plaintiff appeared alert.  Plaintiff

reported that her migraine medication was not working, and that she "stop[ped] [taking Paxil

because she] was feeling very jittery." (Id. at 167).  Plaintiff further reported she does not sleep

well and rarely naps.  (Id.)  Thereafter, Daly prescribed Steen Serzone.  (Id.)

On October 11, 2001, Daly noted Plaintiff felt better on her medication, but that she has

passing thoughts of hurting herself and continued to report panic-like situations when outside and

crossing streets.  (Id. at 168).  As a result, Daly increased her medication.  (Id.)  On October 26,

2001, Plaintiff reported her medication helped her sleep and relax.  (Id. at 169).  Finally, on

October 31, 2001, Plaintiff reported "that [she] has not taken medication regularly."  (Id.)

Plaintiff further reported never taking the Serzone and was not faithfully taking any of the

medications because she is uncomfortable taking medication.  (Id. at 170).  Plaintiff then agreed

Page 9

to take Risperdal.  (Id.) This was the last recorded meeting on file.

### 7. Dr. Chinwendu Anukwuem's Report

At the request of Plaintiff's attorney, Dr. Chinwendu Anukwuem, an optometrist, completed a Multiple Impairments Questionnaire on January 7, 2002.  (Id. at 185).  Dr. Anukwuem reported treating Plaintiff between July 6, and July 23, 2001.  (Id.)  Dr. Anukwuem's diagnosis concluded Plaintiff had no vision in her right eye since she was a child, that she had dry eyes and myopia and presbyopia in her left eye.  (Id.)

### 8. Dr. Adeoti's Letter

A letter dated May 23, 2002, written by Dr. Adeoti, reported Plaintiff has a history of acute gastritis with gastroparesis, irritable bowel syndrome, diverticulosis and colitis, diabetes, hypertension, arthritis, glaucoma, and asthmatic bronchitis.  (Id. at 196).  Dr. Adeoti opined that Plaintiff has significant medical limitations "that might preclude her from engaging in gainful employment." (Id.)

### 9.Dr. O'Shea's Report

At the request of Plaintiff's attorney, Dr. O'Shea, a psychiatrist, completed a Psychiatric/ Psychological Impairment Questionnaire on July 18, 2002.  (Id. at 199).  Dr. O'Shea reported treating Plaintiff between August 9, 2001, and July 3, 2002.  (Id.)  Dr. O'Shea diagnosed Plaintiff with an affective disorder causing panic attacks, sleep disturbance, and poor concentration.  (Id.) In her DSM-IV analysis, she found Plaintiff had a "current GAF [of] 65," and that her highest GAF that year was 60.  (Id.)  Thus, Plaintiff's ability to function improved from moderate to mild difficulties.  Dr. O'Shea gave a fair prognosis, provided that Plaintiff continued her medication

Page 10

and group therapy.  (Id.)

Dr. O'Shea noted that Plaintiff's "depression has been prevalent since the late 1980's."
(Id. at 202).  Additionally, Dr. O'Shea found that Plaintiff was moderately limited in her ability
to interact with the general public and in her ability to travel to unfamiliar places or use public
transportation.  (Id. at 202-04).  She also noted that Plaintiff tends to withdraw when she
becomes overwhelmed.  (Id. at 204).  Dr. O'Shea reported that Plaintiff did not have a low IQ or
reduced intellectual functioning, but when prompted to elaborate, explained: "[t]he Intake
Clinician's statement about patient 'looking for help in getting SSI,' was not a condemnation, but
rather a statement of advocacy.  Mental Health Professionals typically assist patients in getting or
applying for entitlement programs."  (Id. at 205).

### D. Administrative Law Judge Muehlig's Decision

Based upon the testimonial and medical evidence above, with the exception of Dr.
Adeoti's letter and Dr. O'Shea's evaluation, the ALJ found Plaintiff was capable of returning to
her past relevant work ("PRW") as a retail salesclerk, and thus was not entitled to disability
benefits.  (Id. at 19-20).  The ALJ  found Plaintiff was not engaged in any gainful activity since
the alleged onset of her disability and that although her impairments were sufficiently severe, it
did not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4
(the "Listed Impairments") and Plaintiff's "allegations regarding her impairments [were] not
entirely credible."  (Id. at 20).

Specifically, the ALJ found Plaintiff lacked credibility because her complaints were
contradicted by objective medical evidence, she was noncompliant with medication that

Page 11

improved her mental health, and her own reported activities belied the nature of her alleged

impairments.  (Id. at 18-19).  Relying heavily on the findings of Drs. Mohit, Dr. Materna and the

State Agency medical consultants, as well as his own perceptions of Plaintiff during the hearing,

the ALJ found Plaintiff retained the RFC "to perform the exertional demands of light work . . .

somewhat diminished by her visual limitations."  (Id. at 19).  After determining Plaintiff's former

position as a retail salesclerk fell within the light exertion level, according to the defintion

provided by the Dictionary of Occupational Titles ("DOT"), the ALJ concluded Plaintiff was

capable of performing her PRW at all times relevant, "as she actually formerly performed it and

as generally performed within the national economy."  (Id. at 19).

## II. DISCUSSION

### A. Standard of Review

Review of the ALJ's final decision is made pursuant to 42 U.S.C. § 405(g) (2000).  Sims

v. Apfel, 530 U.S. 103, 106 (2000); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Section

405(g) provides, in pertinent part:

> Any individual, after any final decision . . . made after a hearing to which
> he was a party, irrespective of the amount in controversy, may obtain a
> review of such decision by a civil action.

42 U.S.C. § 405(g)(2000).  Section 405(g) permits a District Court to review the transcripts and

records upon which the ALJ's determination is based.  Morales v. Apfel, 225 F.3d 310, 316 (3d

Cir. 2000).  If supported by substantial evidence, the factual findings of disability must be

accepted as conclusive.  Plummer, 186 F.3d at 427; Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.

2000); Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995); Williams v. Sullivan, 970 F.2d 1178,

Page 12

1182 (3d Cir. 1992).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept to support a conclusion." Morales, 225 F.3d at 316; Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); (quoting, Pierce v. Underwood, 487 U.S. 552, 565 (1988)).  However, it must be "more than a mere scintilla." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000); Ventura, 55 F.3d at 901 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The substantial evidence standard allows a Court to review the ALJ's decision, while avoiding interference with the administrative responsibilities of the Commissioner.  Stewart v. Secretary of Health, Educ. and Welfare, 714 F.2d 287, 290 (3d Cir. 1983); Claussen v. Chater, 950 F.Supp.1287,1292 (D.N.J. 1996).  The standard is "deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  The record must be reviewed as a whole to determine whether substantial evidence supports the ALJ's decision.  Id.

Although reasonable minds can reach different conclusions, in such cases, the function of the District Court is to determine whether the record, as a whole, contains substantial evidence to support the ALJ's findings.  Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994); (quoting, Richardson, 402 U.S. at 401); Schaudeck, 181 F.3d at 431.  A court may not displace the choice of an administrative body "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  N.L.R.B. v. Greensburg Coca-Cola Bottling Co., 40 F.3d 669, 672-73 (3d. Cir. 1994); (quoting Universal

Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)); see also Hartranft, 181 F.3d at 360.

Nonetheless, an ALJ is expected to do more than simply state factual conclusions.  Stewart, 714

F.2d at 290; Claussen, 950 F.Supp at 1292.  Rather, an ALJ must make specific findings of fact

to support his or her ultimate findings.  Sykes v. Apfel, 228 F.3d 259, 269 (3d Cir. 2000).

An ALJ must consider all medical evidence in the record and provide adequate

explanations for disregarding or rejecting evidence, especially when the testimony of a treating

physician is rejected.  Morales, 225 F.3d at 320; Plummer, 186 F.3d at 429; Wier v. Heckler, 734

F.2d 955, 961 (3d Cir. 1984); Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  An ALJ must

also give serious consideration to the claimant's subjective complaints of pain, even when those

assertions are not fully confirmed by objective medical evidence.  Mason v. Shalala, 994 F.2d

1058, 1067-68 (3d Cir. 1993); Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986).  Where a

claim is supported by competent evidence, an ALJ must specifically weigh that evidence.

Schaudeck, 181 F.3d 429, 435 (citing, Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.

1979)).

## B. Five-Step Sequential Analysis

Title II[2] of the Act provides for the payment of benefits to persons who suffer from

disabilities that have made contributions to the disability insurance program.  42 U.S.C. §

423(a)(1)(D) (2000).  Title XVI of the Act, entitled Supplemental Security Income for the Aged,

Blind and Disabled,[4] provides for the payment of benefits to indigent persons who are disabled.

---

[2]     Act of 14 Aug. 1935, Pub. L. No. 271, ch. 531, §§ 201-10 (codified as
        amended 42 U.S.C. §§ 401-33).
[4]     Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 1601-36, 86
        Stat. 1465-93 (codified as amended at 42 U.S.C. §§ 1381-83d).

42 U.S.C. § 1381(a) (2000).[5]

Both Titles II and XVI provide for the payment of benefits when a claimant establishes his or her inability:

> to engage in any substantial gainful activity [("SGA")] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A) (2000); 1382c(a)(3)(B) (2000); see also Schaudeck, 181 F.3d at 431.

The Act further provides that an individual will be considered disabled

> if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(2)(A) (2000), 1382c(a)(3)(B) (2000); see also Sykes, 228 F.3d 259, 262.

In accordance with authority granted under 42 U.S.C. § 405(a), as incorporated by reference in 42 U.S.C. § 1383(d)(1), the Commissioner has promulgated regulations (the "Regulations") to give effect to and further define the provisions of the Act.  20 C.F.R. §§ 404.1520, 416.920 (1985).  The Regulations provide for a five-step sequential evaluation of the claim of an individual for DIB and SSI.  Morales, 225 F.3d at 316; Sullivan, 493 U.S. at 525; Knepp, 204 F.3d at 82; Schaudeck, 181 F.3d at 431-432.

## 1. Step One of the Five Step Analysis

In Step One, the ALJ must determine whether the claimant is currently engaging in SGA.

---

[5]     Because the standards of eligibility under Title II and judicial review thereof are virtually identical to the standards under Title XVI, decisions rendered under 42 U.S.C. § 423 are also applicable to decisions rendered under 42 U.S.C. § 1381a.  Sullivan v. Zebley, 493 U.S. 521, 525 n.3 (1990).

20 C.F.R. §§ 404.1520(a), 416.920(a) (1985).  SGA is defined as:

> work that is both substantial and gainful. . . .  Substantial work activity is
> activity that involves doing significant physical or mental activities. . . .
> Gainful work activity is work activity that [the applicant] do[es] for pay or
> profit.

20 C.F.R. §§ 404.1572, 416.972 (1980).  If a claimant is found to be engaged in SGA, the claim

will be denied, regardless of medical condition.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987);

(citing, 20 C.F.R. § 404.1520(b) (1980)).  If, however, the claimant is not engaged in SGA, the

analysis of the claim proceeds to step two.

## 2. Step Two of the Five Step Analysis

This step, commonly known as the "severity regulation," involves a minimum threshold

determination of whether the claimant is suffering from a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c) (1980).  An impairment is considered severe if it is "of a magnitude

sufficient to limit significantly the individual's 'physical or mental ability to do basic work

activities.'"  Santise v. Schweiker, 676 F.2d 925, 927 (3d Cir. 1982); (quoting 20 C.F.R. §

404.1520(c) (1980)).

Evidence of a "physical or mental impairment" must be "demonstrable by medically

acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3) (2000).  "An

individual shall not be considered to be under a disability unless [she] furnishes such medical and

other evidence of the existence thereof as the Commissioner may require."  42 U.S.C. §

423(d)(5)(A) (2000).  The Commissioner, however, cannot make "speculative inferences from

medical opinions;"  a medical opinion may only be rejected on the basis of "contradictory

medical evidence."  Plummer, 186 F.3d at 428.  When a medically determinable impairment

exists which can reasonably be expected to produce pain, the intensity and persistence of

symptoms must also be evaluated in order to determine what impact, if any, they have on the

ability of the claimant to work.  Sweeney v. Comm'r of Soc. Sec., No. 99-6048, slip op. at 17 (3d

Cir. June 20, 2000); (citing, 20 C.F.R. § 416.929(c)(1) (1991)).

> If a claimant's symptoms suggest a greater restriction of function than can
> be demonstrated by objective evidence alone, consideration will also be
> given to such factors as the individual's daily activities; the location,
> duration, and intensity of the individual's pain; precipitating and
> aggravating factors; the type, and side effects of medication; treatment
> received for the relief of pain; and any other measures used for pain relief.

Id.  (Referencing 20 C.F.R. § 416.929(c)(3) (1991); SSR 96-7p (1996)).

After determining the individual's impairments, the analysis next concerns the

individual's ability to do basic work activity, which is:

> defined as "the abilities and aptitudes necessary to do most jobs." [20
> C.F.R.] §§ 404.1521(b), 416.921(b).  Such abilities and aptitudes include
> "[p]hysical functions such as walking, standing, sitting, lifting, pushing,
> pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing,
> and speaking"; "[u]nderstanding, carrying out, and remembering simple
> instructions"; "[u]se of judgment"; "[r]esponding appropriately to
> supervision, co-workers, and usual work situations"; and "dealing with
> changes in a routine work setting."

(Bowen, 482 U.S. at 141 (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b) (1985)).

An ALJ need only consider medical evidence in step two, without regard to vocational

factors such as the age, education, or work experience of the claimant.  Id. (citing 20 C.F.R. §§

404.1520(c), 416.920(c) (1980)).

In step two of the analysis, the claimant must make the threshold showing that his or her

impairments are sufficiently severe to satisfy this standard.  Bowen, 482 U.S. at 146 n.5.  If a

claimant fails to make this showing, he or she is ineligible for DIB or SSI benefits. Id. at 148;

<u>Santise</u>, 676 F.2d at 927.  However, if the claimant is not engaged in SGA and has a severe impairment, the evaluation proceeds to step three.

### 3. Step Three of the Five Step Analysis

This step requires a determination of "whether the impairment is equivalent to one of a number of [the] [L]isted [I]mpairments that the Commissioner acknowledges are so severe as to preclude [SGA]."  <u>Bowen</u>, 482 U.S. at 141.  "If the impairment meets or equals [a] [L]isted [I]mpairment [], the claimant is conclusively presumed to be disabled." <u>Id.</u>; <u>see</u> <u>also</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) (1980); <u>Schaudeck</u>, 181 F.3d at 432.  However, if a claimant does not suffer from a "Listed Impairment," or its equivalent, the analysis proceeds to determining the claimant's RFC so that, in steps four and five, the ALJ can "determine whether the claimant retains the ability to perform either [her] former work or some less demanding employment." <u>Sullivan</u>, 493 U.S. at 535; (quoting, <u>Heckler v. Campbell</u>, 461 U.S. 458, 469 (1983)); <u>see</u> <u>also</u> <u>Adorno</u>, 40 F.3d at 46; <u>Williams</u>, 970 F.2d at 1187.

### 4. Step Four of the Five Step Analysis

Before moving on "from step three to step four, [the ALJ must] assess [the claimant's] [RFC]."  20 C.F.R. § 404.1520(a)(4) (1980).  In Step Four, the ALJ must decide whether the claimant retains the RFC to perform her PRW.  20 C.F.R. §§ 404.1520(e), 416.920(e) (1980); <u>Schaudeck</u>, 181 F.3d 431.  RFC is defined as what the claimant "can still do despite [her] limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a) (1991).  An ALJ must evaluate the physical and mental requirements of past work experience of the claimant in determining her RFC. <u>Knepp</u>, 204 F.3d at 82; <u>Velazquez v. Heckler</u>, 802 F.2d 680, 682 (3d Cir. 1986); 20 C.F.R. §§ 404.1520(e), 416.920(e) (1980).  PRW is defined as work "done within the last 15 years, [that]

lasted long enough for [the claimant] to learn to do it, and was [SGA]."  20 C.F.R. §§ 404.1565(a), 416.965(a) (1980).

"At step four, vocational factors [such as age, education and work experience] are not considered in determining whether or not a claimant retains the [RFC] to perform [PRW]." Williams, 970 F.2d at 1887; see also 20 C.F.R. §§ 404.1560(b), 416.960(b) (1990).  If the claimant is able to meet the demands of his or her past work, then he or she is not disabled within the meaning of the Act.  Bowen, 482 U.S. at 141; Schaudeck, 181 F.3d at 432; Adorno, 40 F.3d at 46.  If the claimant is not able to perform her particular PRW, but is able to perform "the functional demands and job duties of the job as ordinarily required by employers throughout the national economy," then the claimant is "not disabled" within the meaning of the Act.  Social Security Ruling ("SSR") 82-61 (1982).  In determining the demands of a claimant's PRW as it is performed in the national economy, the "Dictionary of Occupational Titles descriptions can be relied upon . . . to define the job as it is usually performed in the national economy." Id..

At step four, as with the previous steps, the claimant bears the burden of proof.  Bowen, 482 U.S. at 146 n.5; Adorno, 40 F.3d. at 46.  If a claimant demonstrates that she is not able to resume her former occupation, as she performed it particularly or as it is performed in the national economy, the evaluation proceeds to the final step.

**5. Step Five of the Five Step Analysis**

At this final stage, the burden of proof shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. Morales, 225 F.3d at 316; Bowen, 482 U.S. at 146 n.5; Adorno, 40 F.3d at 46.  Furthermore, a determination of disability by an ALJ at step five must be based upon the age, education, work

experience, and the RFC of the claimant.  20 C.F.R. § 404.1520(f), 416.920(f) (1980);

Schaudeck, 181 F.3d at 432.  The ALJ must also analyze the cumulative effect of all of the

impairments of the claimant.  20 C.F.R. §§ 404.1545, 416.945 (1991).

### C. Analysis

The ALJ followed the five-step sequential analysis and concluded Plaintiff was not

disabled.  (Tr. 14-20.)  The ALJ's finding that Plaintiff could return to her PRW, despite her

impairments, is supported by substantial evidence found in the record and therefore this Court

affirms the ALJ's decision.

In her moving brief, Plaintiff argues (1) the ALJ erroneously determined she could

perform her PRW; (2) erroneously assessed the credibility of her subjective complaints; and (3)

erred in failing to evaluate her mental impairments.  (Moving Br. at 9, 12, 14).  In the reply brief,

Plaintiff additionally argues that the ALJ erred in failing to address whether her specific

impairments met the New Listings.  (Reply Br. at 2).

### 1. Step Three: Whether Steen's Impairments Meet or Equal a Listed Impairment

At step three, the ALJ found that "the claimant's conditions do not meet or equal the

relevant criteria in the Listing of Impairments;" noting that, "[n]o treating or examining physician

has mentioned findings equivalent in severity to the criteria of any listed impairment."  (Tr. 16).

The ALJ went on to summarize and assess the medical evidence in the record, as well as

Plaintiff's own hearing testimony, to support his conclusion regarding step three before moving

on to his RFC determination.  (Id. at 16-18).

In her reply brief, Plaintiff argues for the first time, that the "ALJ erred as a matter of law

in failing to assess or to provide any reasons for his obvious summary conclusion that the

claimant did not meet or equal Listing 1.04A." (Reply Br. at 4). When Steen refers to "Listing 1.04A," she is referring to the New Listings, that became effective February 19, 2002. See, Revised Medical Criteria for Determination of Disability, 66 Fed. Reg. 58,010, 58,011 (2001). The Commissioner explains the impact of the effective date, in pertinent part, as follows:

> With respect to claims in which we have made a *final decision*, and that are pending judicial review in Federal court, we expect that the court's review of the Commissioner's final decision would be made in accordance with the rules in effect at the time of the final decision.

(Id.)(emphasis added.) This guidance is significant because the ALJ issued his decision on January 25, 2002, several weeks before the New Listings took effect. Plaintiff did appeal this decision after the effective date of the New Listings, but the Appeals Council denied her request for review, and informed her that, as a result, "the [ALJ]'s decision stands as the *final decision* of the Commissioner." (Tr. 4). (emphasis added).

Moreover, even though the Appeals Council considered whether Plaintiff's impairments met the New Listings, because the Council denied review of her claim, the ALJ Decision, not the denial by the Council, stands as the final decision of the Commissioner. See, Sims, 530 U.S. at 107 ("[I]f, as here, the Council denies the request for review, the ALJ's opinion becomes the final decision"). In an unpublished opinion, the Third Circuit, faced with choosing between the new and original Musculoskeletal Listings, concluded without discussion of the Appeals Council, that "[f]or purposes of our analysis, we review the ALJ's decision based upon the law that was in effect at the time of the ALJ's decision." Caruso v. Comm'r of Soc. Sec., No. 03-2709, 2004 WL 1147065, at *2 (3d Cir. May 19, 2004). As a result, Plaintiff's arguments that she meets the relevant criteria of the New Listings are only relevant if this case is remanded, and are not a basis for remand.

Additionally, Plaintiff's argument that the ALJ "conclusory statement" that her

impairments did not meet or equal a listed impairment is "beyond meaningful judicial review"
also lacks merit.  (Reply Br. at 5).  Plaintiff cited the Third Circuit's rule that an ALJ's
"conclusory statement that a claimant's impairments did not meet or equal a listed impairment,"
made the record beyond meaningful judicial review.  Burnett, 220 F.2d at 119-120.  However,
the Third Circuit clarified its position in Burnett by explaining that the law of that case:

> does not require an ALJ to use 'magic language' or adhere to a particular
> analytical format.  Rather, the purpose of Burnett is to ensure sufficient
> development of the record and explanation of findings to permit
> meaningful judicial review.  In this case, the ALJ's decision, read as a
> whole, convinces us that he considered the appropriate factors in reaching
> the conclusion that [the claimant] did not meet the criteria of any of the
> listed impairments...

(Caruso, 2004 WL 1147065, at *2.)  The Court then went on to quote the ALJ's discussion of the
Listing of Impairments in that case, which is more than substantially similar to The ALJ's
"summary" discussion in the matter at hand.  Id.  The ALJ's decision as a whole, like that found
in Caruso, permits meaningful review; as he not only develops the record in detail, but also
explains his findings through his analysis of the evidence before him.  (Tr. 16-18).  The ALJ's
discussion here of the relevant medical evidence clearly denotes that he was concerned with
whether Plaintiff's impairments met or equaled Listing 1.05(C)(presently revised in 1.04(A)).
See, 20 C.F.R. Pt. 404, Subpt. P. App. 1, Pt. A § 1.05(C) (2001).  He specifically discussed
Plaintiff's reported pain; her "normal range of motion in her cervical and lower back area;" her
lack of motor abnormality, reflex abnormality and muscle atrophy; and the limited radicular
distribution of her sensory loss, which was confined to the proximal regions of her upper
extremities.  (Tr. 17).  This evidence does not substantiate a finding that Plaintiff met Listing
1.05(C), or, for that matter, New Listing 1.05(A).  As a result, this Court is able to find, from the
record as a whole, that the ALJ's step three conclusions are supported by substantial evidence.

### 2. Step Four: Whether Steen's Residual Functional Capacity Enables her to Perform her Past Relevant Work



#### A. ALJ Muehlig's Residual Functional Capacity Determination

At step four, the ALJ found that Plaintiff  "retain[ed] the [RFC] to perform the exertional

demands of light work, or work which requires maximum lifting of 20 pounds and frequent

lifting of 10 pounds." (Tr. 19).  He also noted that light jobs can be performed while standing or

sitting, but those performed while seated usually "require the worker to operate hand or leg

controls*."* (Id.)  The ALJ further restricted Plaintiff's capacity "somewhat" by her "visual

limitations." (Id.)  These particular findings almost exactly mirror those found in Dr. Walsh's

RFC Assessment, and the ALJ reported that he relied upon the examination reports of Drs. Mohit

and Materna, as well as the report of the reviewing State Consultants, e.g. Drs. Walsh, Yeager,

and Levine. (Id.)

At this stage of step four, the ALJ is required to evaluate all of the relevant evidence,

explain his reasons for rejecting any such evidence, give the claimant's subjective complaints

serious consideration, and make specific findings of fact, including credibility, as to the

claimant's RFC.  Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002).   The ALJ carefully

reviewed and summarized the reports of treating and examining physicians in his opinion. (Tr.

16-19).  Plaintiff argues that the ALJ "failed to set forth any cause for rejecting the opinion,"of

her treating physician, Dr. Chidi Anukwuem; but as the ALJ explained:

> The opinions expressed by Dr. Anukwuem are quite conclusory, providing
> very little explanation of the evidence relied on in forming those opinions.
> Dr. Anukwuem apparently relied quite heavily on the subjective report of
> symptoms and limitations provided by the claimant, and seems to have
> uncritically accepted as true most, if not all of what the claimant reported. .
> . . [T]he doctor's opinion contrasts sharply with other evidence of record,
> which renders it unpersuasive.

(Tr. 16).  Here, the ALJ concluded that the doctor's opinions were not persuasive because they

relied almost entirely upon Plaintiff's complaints, whom he also found lacked credibility; and

further starkly contrasted the findings of Dr. Mohit, the State Agency Consultants, and Plaintiff's

claims managers.  (Id. at 142-146, 150-157, 158-160, 122-129.)  An ALJ may choose which doctors to credit as long as this choice is supported by substantial medical evidence. Morales, 225 F.3d at 318.  The ALJ Muehlig's choice to discredit Dr. Anukwuem's findings were supported by substantial medical evidence in this case.

Initially, it is important to note that an ALJ's credibility findings are given "great weight" upon review.  Cotter, 642 F.2d at 704.  In evaluating Plaintiff's subjective complaints, the ALJ noted that he was required to give careful attention to any information relating to Plaintiff's pain, aggravating factors, pain medication, other kinds of treatment for pain relief, any functional restrictions, and Steen's daily activities.  (Tr. 18); (citing 20 C.F.R. §§ 404.1529, 416.929 (1997); SSR 96-7p (1996)).  The ALJ concurrently evaluated Plaintiff's relevant complaints while comparing them to objective evidence in the record and determined she lacked credibility.  (Tr. 18-19).

Specifically, the ALJ found that Plaintiff's complaints regarding her ability to stand and walk conflicted with Dr. Mohit's orthopedic findings.  (Tr. 18).  The ALJ concluded that Plaintiff does experience "some degree of pain" in her lower back after considering the fact that Dr. Mohit's orthopedic report only found some pain on straight leg raising bilaterally and decreased sensation in her upper extremities, while finding normal ranges of movement in her neck and back, no reflex or motor abnormalities, and no muscle atrophy.  (Id.)  Significantly, the absence of muscle atrophy can be used to contradict the claimant's pain complaints since it shows the claimant was not restricting her body due to pain.  See, McCarthy v. Comm'r of Soc. Sec., No. CIV 95-4534 JBS, 1999 WL 325017, at *16 (D.N.J. May 19, 1999).  The ALJ also pointed out that, although Plaintiff complained of dizzy spells, she has never been treated for this condition.

(Tr. 18).  He took note of the lack of discomfort Plaintiff exhibited during the hearing, while qualifying that observation as having only some weight in his credibility analysis.  (Id.)  The ALJ further observed that Plaintiff's weight belied how well she followed her prescribed diet, and that her monocular vision was the result of an injury occurring over thirty years ago.  (Id.)

        The ALJ also noted that Plaintiff did not commence treatment for her mental health until after her claim was denied at reconsideration.  (Id.. at 19).  He commented on her noncompliance with prescribed medication while being treated for her mental health.  (Id.)  Specifically, Plaintiff was almost immediately prescribed Serzone because she reported Paxil made her "jittery;" and she repeatedly reported that Serzone improved her situation. (Id. at 167-68).  Then, on her last visit, she finally admitted without an explanation that she was not in fact taking her new medication regularly, even though she reported that it improved her situation.  (Id. at 168).  The ALJ also pointed out that a clinician at Beth Israel commented that Plaintiff might have been "looking for help to get SSI."  (Id. at 18, 175).  Plaintiff argues that it was error for the ALJ to "deny benefits, based on the failure to follow prescribed treatment."  (Reply Br. at 9).  However, the ALJ did nothing of the sort.  Rather, in evaluating her credibility to determine her RFC, he pointed out she was not truthful in her statements to the clinician.

        Finally, the ALJ observed that Plaintiff's "own reported activities reveal that she is not particularly limited by her impairments," as she reported at the hearing that she babysat her grandchildren, did light housekeeping, and went shopping with her daughter.  (Tr. 19, 34, 52).  Although Plaintiff correctly points out that the Third Circuit does not permit such activities to show an ability to engage in SGA,, here the ALJ was only using this information to show that Plaintiff did not suffer total incapacity.  Fargnoli v. Massanari, 247 F.3d 34, 40 n.5 (3d Cir.

2001).

From the foregoing reasons it is clear that the ALJ's conclusion that Plaintiff retained the RFC to perform light work is supported by substantial relevant evidence in the record.

## B. The ALJ's Past Relevant Work Determination

After determining Steen's RFC, the ALJ assessed whether Plaintiff could perform her past work as a retail salesperson.  Determining a claimant's ability to engage in PRW requires:

> a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits the ability to meet the physical and mental demands of the work and (3) supplementary or corroborative information from other employers, such as the [DOT], etc., on the requirements of the work as generally performed in the national economy.

Burnett, 220 F.3d at 120.

 At the hearing, Plaintiff testified that her work at Value City comprised cashiering, packing merchandise, lifting boxes weighing 50 pounds or more, handling customer returns, and ensuring the floors were clean and the aisles straightened.  (Tr. 46-47).  From this testimony, the ALJ assessed Plaintiff's PRW was as a retail salesclerk, which the DOT categorizes as requiring "Light Work," a "Reasoning" level of 3 and a "Specific Vocational Preparation" ("SVP") level of 3.  U.S. Dep't. of Labor, Dictionary of Occupational Titles, § 261.357-066 (4th ed. Rev. 1991).

Specifically, light work consists of "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently . . . walking or standing to a significant degree . . . or [may] require[] sitting most of the time but [while] pushing and/or pulling of arm or leg controls."  Id.  A reasoning level of 3 requires of Plaintiff the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and to

d]eal with problems involving several concrete variables in or from standardized situations."

(Id.)  Finally, an SVP level of 3 requires "[o]ver 1 month up to and including 3 months of

training."  (Id.)

Plaintiff further testified that her ulcers, frequent need to use the restroom, numbness in

her hands, and her arthritis made work increasingly difficult; although she did note she no longer

had to do a lot of bending or reaching as she became "more like a lead person."  (Tr. 48-49, 54).

From this testimony, and the available medical evidence, the ALJ oncluded that Plaintiff's

> former job as a retail salesperson did not require the performance of work
> activities precluded by her medically determinable impairments.  In light
> of the foregoing, the undersigned concludes that the claimant has been
> capable of performing her [PRW] as a retail salesperson at all time[s]
> relevant herein, as she actually formerly performed it and as generally
> performed within the national economy."

(Id. at 19).

Plaintiff argues that the ALJ incorrectly determined she could perform her PRW because

she cannot meet the DOT's requirements.  (Moving Br. at 10-11).  Plaintiff argues that the

restrictions the ALJ put her ability to work limit her to work requiring no more than a reasoning

level of 1, requiring the ability to carry out only simple instructions.  (Id.)  However, the ALJ did

not place any mental restrictions on Plaintiff's RFC, and her own testimony regarding her former

duties demonstrates she can perform at a reasoning level of 3.  (Tr. 46-47; see Opp'n Br. at 12).

Moreover, SSR 82-61, in order to deny benefits at this step, requires that Plaintiff either

be able to perform "[t]he actual functional demands and job duties of a particular past relevant

job" or "[t]he functional demands and job duties of the occupation as generally required by

employers throughout the country."  SSR-82-61.  The ALJ, after determining Plaintiff's RFC for

light work, found Plaintiff could perform both.  (Tr. 19).  Although it is not entirely clear whether

Plaintiff can perform the actual demands of her PRW, and the Commissioner does not think she could, it is clear from the record and Plaintiff's testimony that she could perform her PRW as it is performed in the national economy, (Tr. 46-50, 143-46, 150-157). <u>See</u>,U.S. Dep't. of Labor, <u>Dictionary of Occupational Titles</u>, § 261.357-066.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the finding that Plaintiff was not disabled, as the term is defined by the Social Security Act, was supported by substantial evidence in the record.  The decision of the ALJ is hereby **affirmed**.

**SO ORDERED.**


** S/ Dennis M. Cavanaugh**
DENNIS M. CAVANAUGH, U.S.D.J.


Date:   March 13, 2006
Orig:   Clerk's Office
cc:     All Counsel of Record
        The Honorable Mark Falk, U.S.M.J.
        File